# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

DANIEL LYNN BROWN, JR.,      )
                                   )
                Plaintiff,    )
                                   )
     v.                        )     Case No. 1:15-cv-0224-TWP-DML
                                   )
UNITED STATES OF AMERICA,    )
                                   )
              Defendant.    )

## ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendant the United States of America ("United States").[1] The Plaintiff in this Federal Tort Claims Act ("FTCA") action is Daniel Lynn Brown, Jr. ("Mr. Brown"). Mr. Brown alleges in his Amended Complaint that the United States was negligent in providing treatment after he fractured his right leg while he was incarcerated at the Federal Correctional Institution-Terre Haute ("FCC-TH"). He seeks compensatory damages. For the reasons explained in this Entry, the United States' Motion for Summary Judgment, dkt. [124], is **granted.**

## I. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] On March 17, 2015, Mr. Brown filed his Amended Complaint bringing claims against the United States, Dr. Mickey Cho, Dr. Gary Ulrich, and UAP Clinic arising from the medical care and treatment he received for his fractured leg. Dkt. [4]. Dr. Mickey Cho, Dr. Gary Ulrich, and UAP Clinic were dismissed as defendants on August 16, 2016. Dkt. [119].

matter of law." Federal Rule of Civil Procedure 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007).

## II. BACKGROUND

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Brown as the non-moving party. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

### A.     Summary of Mr. Brown's Medical Care

On August 19, 2012, Mr. Brown was brought to FCC-TH Health Services via a gurney and was assessed by LPN Danna Dobbins ("Nurse Dobbins") for a right leg injury. Mr. Brown reported that, while playing soccer, he ran into another inmate's shin. Nurse Dobbins noted an obvious closed fracture to the right lower tibia, palpable pedal pulses, and that Mr. Brown's foot was warm, dry, and with normal coloration. Mr. Brown's leg was splinted. Over the telephone, Dr. William Wilson ("Dr. Wilson"), the Clinical Director of FCC-TH, gave a verbal order to send Mr. Brown to the Union Hospital emergency room via ambulance for further evaluation. *See* Dr. Wilson's Declaration, Dkt. [124]-2, ¶ 10.

Mr. Brown was transferred and admitted into Union Hospital with a right tibia and fibia fracture on August 19, 2012. Once he was transferred to Union Hospital, Dr. Wilson was not the treating or admitting physician, and Mr. Brown was under the care of the admitting physician at

Union Hospital. As such, neither Dr. Wilson nor any other member of the Bureau of Prisons ("BOP") medical staff made any decisions regarding Mr. Brown's treatment while he was admitted to Union Hospital, including, but not limited to, if and when to discharge Mr. Brown. Rather, those decisions were made by the hospital treating physicians. *Id.* at ¶¶ 11-12.

On August 20, 2012, while at Union Hospital, Dr. Mickey Cho performed a closed reduction and intramedullary nailing of Mr. Brown's right tibia. While being treated at Union Hospital, either Dr. Wilson or another BOP staff physician was advised of the recent developments in his case by the hospital. On August 24, 2012, Dr. Wilson noted that Mr. Brown's tibia fracture was stable and that they were "awaiting ok from ortho for discharge." Dkt. [125]-4, p. 1.

On August 28, 2012, Dr. T. Bailey, M.D. ("Dr. T. Bailey"), noted that Mr. Brown was six days post-operative right tibia fracture, was still with more pain than the physicians caring for him felt was appropriate unless there was instability, and was to be re-evaluated by the orthopedist the following day. *Id.* at p. 2. On August 31, 2012, Dr. T. Bailey noted that Mr. Brown was recovering from reconstructive surgery, that the hospital felt that he could be discharged that day, and that they were awaiting final word from the orthopedist. *Id.* at p. 3.

On August 31, 2012, Mr. Brown was discharged from Union Hospital and transferred back to FCC-TH, where he was seen by LPN Jessica Sawyer for a Medication Reconciliation. Dkt. [125]-5, p. 1. Mr. Brown returned to FCC-TH with orders for Vicodin, two tablets every four hours as needed. *Id.* at p. 2. Physician Assistant Christopher Blila ("PA Blila") gave the order to "change vicodin to percocet 2 TID x 10 days, start on doxycycline 100mg BID x 10 days, and daily vitals through the weekend." *Id.* Mr. Brown was given his first dose of antibiotics and pain medication and instructed to return in the morning for his vitals and medication. He was further instructed to lie with his legs elevated and to avoid sitting for long periods of time. PA Blila gave

the order to give Mr. Brown a wheelchair until he was evaluated by physical therapy. *Id.* The medications and instructions that Mr. Brown received from BOP medical staff were consistent with his discharge instructions from Union Hospital. Dkt. [124]-2, ¶ 16.

On September 4, 2012, Mr. Brown was seen at Sick Call, reporting that his foot was numb and that he was in constant pain. Dkt. [125]-7. Nurse Dobbins noted signs of infection in Mr. Brown's right lower leg and notified PA Blila, who gave a verbal order to x-ray the area to rule out osteomyelitis. The x-ray identified no radiographic evidence of osteomyelitis. Dkt. [124]-2, ¶ 17.

Mr. Brown began physical therapy on September 11, 2012, at which time he reported to Ashley Matchett, a contract physical therapist, that he was told he was 50% partial weight bearing, but that he was in a wheelchair and had not walked in the past ten days. Mr. Brown was to be seen at physical therapy twice per week. Dkt. [124]-2, ¶ 18. He returned to physical therapy on September 13, 2012, reporting to the physical therapist that he was walking with crutches without a boot, which the physical therapist advised against until the orthopedist told him this was okay. Mr. Brown continued to be seen for physical therapy, initially twice per week and then gradually decreasing over time until it was discontinued on January 2, 2014. *Id.*, ¶¶19-20.

On September 18, 2012, Mr. Brown was seen at Sick Call, requesting to speak to his doctor about pain in his leg after his post-surgery narcotic had ended. It was explained to Mr. Brown that the use of pain medications after surgery is short term only and that Nonsteroidal Anti-Inflammatory Drugs ("NSAIDs") were to be used after that, if needed. Later on that same day, Mr. Brown was seen by Mid-Level Provider Z. Ndife, requesting more narcotic pain medication. Naproxen was prescribed. Dkt. [124]-2, ¶ 21.

On September 20, 2012, Mr. Brown was seen in-house by Dr. Gary Ulrich ("Dr. Ulrich"), an orthopedist, for follow up post hospitalization for his tibia/fibula fracture. Dkt. [125]-14. Dr. Ulrich came to FCC-TH to see Mr. Brown. Dkt. [124]-1, p. 19:19-20. Mr. Brown was able to move his right toes and foot without problems. He was instructed to do toe touch weight bearing and continue range of motion exercises with physical therapy. The note indicates that Dr. Ulrich did not want Mr. Brown to take ibuprofen or naproxen so the naproxen was discontinued and he was prescribed meloxicam. Dkt. [125]-14.

On September 24, 2012, Mr. Brown submitted an Inmate Request to Staff, contending that Dr. Ulrich had ordered all NSAIDs stopped and complaining that Dr. Wilson had prescribed more NSAIDs. Dkt. [125]-15. Dr. Wilson responded to Mr. Brown's request the same day, informing him that he saw no medical contraindication to NSAIDs and that they would not cause delayed healing or suffering. Dkt. [124]-2, ¶ 23. Nonetheless, Dr. Wilson ordered the NSAIDs stopped, discontinued the meloxicam, and informed Mr. Brown that he may purchase Tylenol from the commissary. Dkt. [125]-16.

Dr. Wilson evaluated Mr. Brown on September 27, 2012, for follow up of his tibia/fibula fracture. Dkt. [125]-17. Mr. Brown reported burning in the top and medial right foot, that he did not want narcotics, and that he wanted to get out of the wheelchair, which was medically indicated at that time. It appeared that Mr. Brown had neuropathic type discomfort, and Dr. Wilson started him on gabapentin beginning with 100 mg three times per day and gradually increasing to 300 mg three times a day. (Neurontin is the brand name for gabapentin.) Dr. Wilson further requested an electromyography ("EMG") of Mr. Brown's right lower extremity and a repeat x-ray of his right lower leg. A repeat x-ray of Mr. Brown's right leg was taken on October 17, 2012, which showed no osseous bridging. Dkt. [124]-2, ¶ 24.

On October 23, 2012, Dr. Wilson evaluated Mr. Brown again for hypertension, migraines, and follow up of his tibia/fibula fracture. Dkt. [125]-19. Regarding Mr. Brown's right leg fracture, Dr. Wilson noted to ensure follow up with orthopedics and he increased Mr. Brown's gabapentin to 400mg three times a day. Approximately a month later, after Mr. Brown complained of increased pain in his right leg and numbness and pressure in his foot and calf muscle, his gabapentin was again increased, to 600 mg three times a day. Dkt. [125]-20.

On November 28, 2012, Dr. Wilson spoke with the orthopedist regarding Mr. Brown's tibia/fibula fracture. Dkt. [125]-21. The orthopedist stated that Mr. Brown needed a bone stimulator and/or further surgery for incomplete healing of the tibia. Dr. Wilson submitted a request to arrange for a bone stimulator for Mr. Brown to be placed by nursing in-house. On December 3, 2012, Dr. Ulrich completed a Specialist Order Referral ordering a Smith & Nephew bone stimulator for Mr. Brown. Mr. Brown was provided an Exogen bone stimulator, which Dr. Wilson believes was consistent with the referral from Dr. Ulrich. Dkt. [124]-2, ¶ 26.

Mr. Brown was seen for a Chronic Care encounter on December 13, 2012, by Dr. Roger Bailey ("Dr. R. Bailey"). Dkt. [125]-23. Mr. Brown reported that his continuous pain was markedly improved since being placed on gabapentin, but he was still uncomfortable. Dr. R. Bailey requested a follow up consultation with the in-house orthopedist and prescribed Mr. Brown a low dose of tricyclic antidepressants to see if it would be effective for his pain. Mr. Brown was encouraged to use the bone stimulator as prescribed. A Clinical Encounter – Administrative Note completed on January 24, 2013, noted that Mr. Brown began using the bone stimulator on December 13, 2012, and used it 42 times over 43 days. Dkt. [125]-24.

On January 23, 2013, Mr. Brown was transported to Wabash Valley Neurology for another EMG. Dkt. [125]-25. Dr. Lawrence Richter's impression was that the EMG and nerve conduction

studies would be compatible with an axonal injury to the nerves distally in the right lower extremity above the ankle. He recommended clinical correlation. An x-ray of Mr. Brown's right tibia/fibula was ordered on January 24, 2013, to recheck the fracture. Dkt. [125]-26. The findings were "abnormal." "Fracture lucencies still evident, only mild callus bridging from prior. Hardware intact." *Id*. Dr. Ulrich evaluated Mr. Brown in-house on January 24, 2013, as well as the x-ray from that day. Dr. Ulrich recommended continuing the current treatment and scheduling removal of the distal fixation screws, with follow up after the hardware removal. Dkt. [125]-27.

Mr. Brown was seen at Health Services in the prison several times between January 24, 2013 and May 9, 2013, reporting pain in his lower leg, headaches, and blisters on the great toe of his right foot, and requesting changes to his medications. Dkt. [125]-28. Mr. Brown's medications were altered, his blisters were cleaned and dressed with tefla and tape, and he was prescribed Cephalexin (Keflex). *Id*. He was also given a medical surgical shoe/all-purpose boot. Dkt. [125]-29. On April 25, 2013, an x-ray was performed of Mr. Brown's right tibia/fibula. Dkt. [125]-30. The findings were "negative except for: increased callus formation consistent with interval partial healing. Hardware is intact." *Id.*

Dr. Ulrich performed hardware removal surgery on Mr. Brown on May 20, 2013, at Union Hospital. Dkt. [124]-2, ¶ 33; Dkt. [125]-31. Mr. Brown was returned to FCC-TH that same day, at which time he was evaluated by RN Stephen Mize. Dkt. [125]-31. The RN reviewed the discharge instructions with Mr. Brown, noted that his dressing was clean, dry, and intact, and obtained verbal orders from PA Blila to prescribe Mr. Brown Tylenol plus codeine, antibiotics, and daily dressing changes for seven days or until no drainage. *Id.*

Two days later—on May 22, 2013—Mr. Brown was evaluated at Health Services by RN Sarah Walters, complaining of redness and drainage around the surgical incision site. Dkt. [125]-

32. Dr. Wilson was notified and gave verbal orders to send Mr. Brown as a direct admit to Union Hospital for a probable infection. *Id.* Mr. Brown remained at Union Hospital for cellulitis of his surgical site until May 29, 2013, when he was discharged and returned to FCC-TH. Dkt. [125]-33.

Upon Mr. Brown's return to FCC-TH, Dr. Wilson submitted consultation requests to have Mr. Brown seen by neurology and neurosurgery. Dkt. [125]-33. The Utilization Review Committee ("URC") approved the neurology and neurosurgeon consultations on June 5, 2013. Dkt. [125]-34. Once the URC approves consultation requests, they are given to a representative of NaphCare, a third-party independent contractor that is responsible for scheduling consultations with outside providers, such as neurologists and neurosurgeons. Dkt. [124]-2, ¶ 35.

Another x-ray of Mr. Brown's right tibia/fibula was taken on June 7, 2013, to rule out osteomyelitis. Dkt. [125]-35. The x-ray findings were "abnormal. Transverse fractures of distal fibular and tibial shafts with mild osseous bridging. An intramedullary rod with proximal interlocking screws traverses the tibia. Ghost tracks from prior distal interlocking screws are noted." *Id.*

After the hardware removal surgery, Mr. Brown continued to complain of difficulties with the toes on his right foot. On July 3, 2013, he was evaluated by EMT-P Adam Webb, regarding pain in his second toe on his right foot. Dkt. [125]-36. The toe appeared to have a clearing infection although the nail was black. Blood flow was present in the toe. Mr. Brown asked EMT Webb to remove his toenail and drain his toes. EMT Webb advised Mr. Brown that he was not able to perform such a task and that it would have to be done by a physician or PA when he was seen for his sick call. He also explained that, due to short staffing, being seen is taking a little longer. Mr. Brown was provided with a prescription of Keflex and instructed on compliance with

treatment and proper wound care. *Id.* On July 18, 2013, Mr. Brown reported to PTA Burns that he had removed the nails from his first and second toes. Dkt. [125]-37.

On August 8, 2013, Mr. Brown was evaluated in-house by Dr. Ulrich, who recommended a right tibia/fibula x-ray and bone scan. Dkt. [125]-38. An additional x-ray was taken on August 12, 2013, which was "[n]egative and no evidence of orthopedic hardware failure. Healing fractures of the tibia and fibula. Status post ORIF of tibia fracture." Dkt. [125]-39. A nuclear bone scan was ordered on September 24, 2013. Dkt. [125]-40. Also on August 8, 2013, Mr. Brown was seen again by outside neurologist Dr. Richter. Dkt. [125]-41.

Mr. Brown was subsequently seen at Health Services numerous times, complaining of problems with the toes on his right foot. He was given medical boots, weekly wound dressings, and toe splints for these complaints. Dkt. [125]-42. Along with toe complaints, Mr. Brown was also evaluated at Health Services several times for continued complaints about his right leg. His gabapentin dose was increased to 1200mg three times a day and eventually stopped and replaced with Lyrica (brand name for pregabalin), 50mg three times a day, once the necessary approvals were received. Dkt. [125]-43. Another x-ray of Mr. Brown's right tibia/fibula was taken on December 5, 2013, which showed "abnormal. Fracture deformity of the tibia and fibular. Slightly increased bone bridging across the tibial and fibular fractures since the prior study of 8/12/13. Hardware in the tibia is intact." Dkt. [125]-44.

On January 9, 2014, Mr. Brown was evaluated at Goodman Campbell Brain and Spine by neurosurgeon Nicholas M. Barbaro, M.D., FACS. Dkt. [125]-45. Dr. Barbaro's impression was that Mr. Brown had "a substantially recovered injury to the peroneal nerve with partial injury to the tibial nerve based on the EMG." *Id.* He did not recommend surgical exploration with respect

to the nerves, but noted that Mr. Brown may require further orthopedic surgery for his fracture and, if so, lysis of tendon adhesions could be performed at that time.  *Id.*

On February 26, 2014, an x-ray was taken of Mr. Brown's leg, which was "negative" and showed no evidence of orthopedic hardware failure.  It also showed an intramed rod in the tibia and old healed fractures of the distal tibia/fibula.  Dkt. [125]-46.

On March 19, 2014, Dr. Wilson ordered that a follow up appointment be scheduled with orthopedics and that a bone scan of Mr. Brown's lower right leg be scheduled to follow up on the question of malunion fracture.  Dkt. [125]-47.  Dr. Ulrich concurred with the repeat bone scan and orthopedics follow up and arrangements were made to facilitate these two things in the near future. *Id.*

On April 18, 2014, Mr. Brown was seen at Union Hospital Nuclear Medicine for a bone scan.  Dkt. [125]-48.  Mr. Brown continued to see Dr. Ulrich in-house at FCC-TH.  Dr. Wilson spoke with Dr. Ulrich on April 21, 2014, regarding Mr. Brown's case.  Dkt. [124]-2, ¶ 46; dkt. [125]-49.  Dr. Ulrich felt the fracture was healed and resolved and that there was no further need for fracture management.  Dkt. [125]-49.  There was, however, a question of tendon adhesion, and Dr. Ulrich and Dr. Wilson discussed further surgery, including lysis of the adhesions involving the flexors/tibalis anterior tendon.  Dr. Wilson submitted a consultation request for the scheduling of this surgery.  *Id*.  Dr. Ulrich subsequently performed this surgery on July 30, 2014, at the Wabash Valley Surgery Center.  Dkt. [125]-50.

An additional x-ray of Mr. Brown's right tibia and fibula was taken on April 25, 2016, finding no radiographic evidence of an acute fracture, no joint space malalignment, no soft tissue abnormality, and no hardware failure.  Dkt. [125]-51.

**B.      United States' Expert Opinion of Dr. John D. Baldea**

On behalf of the United States, John D. Baldea, M.D. ("Dr. Baldea"), a family medicine physician with a Certificate of Added Qualification in Sports Medicine, employed by Indiana University Health and Indiana University School of Medicine as the Director of the Primary Care Sports Medicine Fellowship, and an Assistant Professor of Clinical Family Medicine, reviewed Mr. Brown's medical records from FCC-TH from May 2008 through August 17, 2015.  Dr. Baldea opined that the medical care provided by BOP medical staff was timely, appropriate, and within the standard of care.  Dkt. [124]-3, Declaration of Dr. John D. Baldea, MD, ¶¶ 1-3.

Among other topics, Dr. Baldea reviewed Mr. Brown's care once he was transferred back to FCC-TH from Union Hospital on August 31, 2012, noting that, following the discharge orders of the attending orthopedic surgeon, Mr. Brown was prescribed short-term courses of appropriate narcotic pain medications and oral antibiotics.  He was instructed to lie with his legs elevated, avoid sitting for prolonged periods of time, and remain in his wheelchair until evaluated by physical therapy.  His pain medication strength was also increased from Vicodin to Percocet.  *Id.,* ¶ 6.  Dr. Baldea opined that this was appropriate medical care reflecting a transfer from a medical facility and that this treatment was more than adequate to manage post-surgical pain and was in keeping with the standard of care.  *Id.*

Dr. Baldea further recounted how, after returning to FCC-TH from Union Hospital, Mr. Brown visited Sick Call frequently, often several times within the same week, complaining mostly of right foot and leg pain, difficulty moving his right big toe, and numbness in his right lower extremity and concluded that Mr. Brown was appropriately triaged for these complaints and placed on "callout" to be seen by medical staff.  *Id.*, ¶ 8.  Dr. Baldea noted that upon more thorough clinical evaluations by a mid-level provider or physician, Mr. Brown often reported levels of pain

that were not reflected in his appearance, vital signs, or physical examination. *Id.* He further noted that Mr. Brown was advised to proceed with physical therapy as ordered and was given appropriate prescription medications for his symptoms. *Id.*

Dr. Baldea also described how, upon discharge from Union Hospital on August 31, 2012, Mr. Brown was prescribed appropriate 10-day courses of analgesic medications to be taken as needed for pain relief and that, following this initial period, he was given ibuprofen and acetaminophen as needed for inflammation and pain management. *Id.*, ¶ 9. When Mr. Brown reported to Sick Call on September 18, 2012, requesting narcotic pain medications for his leg pain, Dr. Baldea opined that he was appropriately told that narcotic medications were for short-term use only and was prescribed naproxen later that same day, which Dr. Baldea found was appropriate for short-term use to help with inflammation and pain. *Id.* Dr. Baldea further opined that a review of the Medication Administration record from FCC-TH indicated that Mr. Brown had standing orders for hydrocodone, oxycodone, and Tylenol with codeine written for him at appropriate post-operative doses and intervals and that, contrary to Mr. Brown's assumptions, crushed opioid medications would likely have a shorter onset of action, but the same duration of action, as uncrushed pills. *Id.*, ¶ 7.

Regarding Mr. Brown's claim that he was inappropriately prescribed NSAIDs for a four-day period ending September 24, 2012, causing him unnecessary pain and suffering and delaying the healing process, Dr. Baldea opined that short-term use of oral NSAIDs would not adversely affect the long-term healing potential of Mr. Brown's fractures. He opined that prescribing NSAIDs was reasonable and appropriate medical aftercare, falling within the standard of care. *Id.*, ¶ 10.

Dr. Baldea further reviewed the medications prescribed to Mr. Brown, concluding that, on September 27, 2012, Dr. Wilson appropriately prescribed Mr. Brown oral gabapentin, including a schedule for progressive increases in medication strength over time, to help with his neuropathic symptoms in his foot. *Id.*, ¶ 11. Following reported side effects from this medication, Dr. Baldea opined that Mr. Brown was appropriately prescribed pregabalin and amitriptyline, both of which he found were appropriate and indicated for the treatment of neuropathic complaints. *Id.* Dr. Baldea concluded that, based on reported symptoms and side effects, Mr. Brown's prescription medications were appropriately tailored to his presentation to Sick Call and general medical visits with the BOP staff, falling within the standard of care. *Id.*

Dr. Baldea also considered the appropriateness of the bone stimulator prescribed by Dr. Ulrich on November 28, 2012, concluding that this form of treatment was frequently prescribed and approved for the treatment of fracture non-union, as in Mr. Brown's case, in accordance with the standard of care. *Id.*, ¶ 12. He further opined that the use of an Exogen bone stimulator would not be contra-indicated in a fracture such as Mr. Brown's, exhibiting radiographic evidence of non-union, four months following the injury. *Id.*

Dr. Baldea also reviewed the physical therapy plan prescribed for Mr. Brown. He opined that the plan, including the treatment frequency and intensity, progress reports, and instructions for home exercises, was appropriate and in accordance with the standard of care. *Id.*, ¶ 13.

Beyond the medications and treatment modalities prescribed for Mr. Brown, Dr. Baldea evaluated the imaging studies and diagnostic tests, including x-rays, nuclear bone scans, and electromyograms that were ordered and performed on Mr. Brown. *Id.*, ¶¶ 14-16. Dr. Baldea concluded that the timing and frequency of the imaging studies and diagnostic tests performed on Mr. Brown were in keeping with the standard of care. *Id.*, ¶ 17.

Upon considering the specialists to which Mr. Brown was referred, Dr. Baldea determined that, as a result of his continued reports of right leg pain, numbness, weakness, and other similar symptoms, Mr. Brown was appropriately referred to medical specialists, including Dr. Ulrich, an orthopedist, Dr. Richter, a neurologist, and Dr. Barbaro, a neurosurgeon, for further assistance with his treatment plan. *Id.*, ¶ 18. According to Dr. Baldea, these consultations with medical specialists demonstrate that the BOP medical staff at FCC-TH sought out numerous experts to assist with the treatment of Mr. Brown's injuries and extensive post-operative care and this level of medical care was well within the standard of care for Mr. Brown's injuries. *Id.* To the extent that Mr. Brown complains that he had to wait six months to see the neurosurgeon and contends that this delay in treatment caused him undue pain and suffering, Dr. Baldea opined that waiting six months to see a neurosurgeon, long after the date of Mr. Brown's injury and surgical treatment, would not have caused any damage or undue suffering to Mr. Brown. *Id.*, ¶ 19.

Dr. Baldea reviewed how Mr. Brown presented to Sick Call with reports of toe pain and soft tissue complaints in his right leg due to difficulty moving his right big toe while walking. *Id.*, ¶ 20. Dr. Baldea concluded that the BOP staff arranged for appropriate medical boots, wound dressings, custom orthotic pads, and regular wound checks for these complaints, all of which were in accordance with the standard of care. *Id.*

After a thorough review of Mr. Brown's medical records, Dr. Baldea concluded that Mr. Brown's general medical care was timely and accurate, and that the medications and treatment modalities prescribed for Mr. Brown, including the use of a bone stimulator, were appropriate and effective for the symptomatic treatment and healing of injuries that he sustained. He opined that Mr. Brown received frequent and thorough physical therapy for his post-operative aftercare, and Mr. Brown had ample and appropriate opportunities to be evaluated by medical specialists in

consultation for his injuries and symptoms during his subsequent recovery. *Id.*, ¶ 21. Ultimately, Dr. Baldea opined that Mr. Brown received frequent, appropriate, and evidence-based medical care from the BOP medical staff at FCC-TH, which was in accordance with the standard of care. *Id.,* ¶ 22.

**C.**     **Mr. Brown's Expert Opinion of Dr. Eric M. Orenstein**

On Mr. Brown's behalf, Dr. Eric M. Orenstein, M.D., FACS, reviewed Mr. Brown's medical records and prepared a written report regarding Mr. Brown's care. Dkt. [105] (Expert Opinion Report); dkt. [124]-5 (excerpts from the Deposition of Dr. Eric M. Orenstein ("Orenstein Dep.")), at 42:23-43:4, 48:14-23). In his initial report dated June 7, 2016, Dr. Orenstein summarized his opinion, in part, by stating:

> In my medical judgment, within a reasonable degree of medical certainty, the standard of care of treatment of the plaintiff's tibua/fibula fracture was breached due to negligence and a delay in diagnosis of the plaintiff's compartment syndrome of the right leg that developed during the claimant's initial hospitalization at Union Hospital for intermittently nailing of the plaintiff's fracture as well as in subsequent care at the Terre Haute Federal Prison Health Service Unit.

Dkt. [105], p. 3. He was asked questions about this opinion and other specifications during his deposition taken on August 10, 2016.

During his deposition, Dr. Orenstein opined, with a reasonable degree of medical certainty, that Mr. Brown developed an acute compartment syndrome in his leg after surgery for the fracture of his tibia and that, because it was untreated, he went on to develop a Volkmann's contracture of the lower extremity primarily involving the anterior compartment and deep posterior department of his leg. Dkt. [124]-5, pp. 19:24-20:8; p. 24:5-13. He testified that acute compartment syndrome usually develops within 72 hours of an injury. *Id.* at p. 20:19-22. Dr. Orenstein testified that Mr. Brown's acute compartment syndrome became symptomatic on August 22, 2012, during his hospitalization at Union Hospital, *id.* at p. 25:9-21; 31:6-22, and that it should have been diagnosed

within 24 hours of that, before he left Union Hospital, *id.* at pp. 32:8-25-33:1.  According to Dr. Orenstein, whoever was evaluating Mr. Brown on that day should have thought of compartment syndrome as a possibility and contacted the treating orthopedic surgeon.  *Id.* at p. 33:2-9; 38:16-39:2.  The treating orthopedic surgeon should then have examined Mr. Brown and checked the tenseness of the muscle compartments, should have passively stretched his foot and ankle to see if that was causing excruciating pain, and, if the findings were positive, should have taken the compartment-pressure measurement of the anterior and posterior compartment.  *Id.* at p. 37:19-38:24.  Dr. Orenstein stated that compartment syndrome is "an emergency condition."  *Id.* at p. 17:1-3.

Dr. Orenstein stated that if Mr. Brown had been diagnosed with acute compartment syndrome at Union Hospital, the treating orthopedic surgeon on that day would have decided and prescribed the treatment for him, which would have been a fasciotomy.  *Id.* at p. 39:3-16.  Dr. Orenstein further noted that a fasciotomy has to occur within 12 hours of the diagnosis.  *Id.* at p. 39:21-25.  Dr. Orenstein affirmed that by the time Mr. Brown was discharged back to the custody of the BOP, he should have already been diagnosed with and treated for acute compartment syndrome.  *Id.* at p. 39:17-25.  When asked specifically whether the BOP physicians should have diagnosed Mr. Brown with acute compartment syndrome, Dr. Orenstein testified,

> [T]he Bureau of Prison physicians are not orthopedic surgeons.  So I think what they did was what they could do. They had already contacted the orthopedist. The orthopedists weren't giving any additional guidance in terms of what additional workup was necessary. And so they were treating it as best they could, I think.

*Id.* at p. 41:2-11.  "[T]he primary care physicians at the Bureau of Prisons were within the standard of care to rely on the opinions of specialists they sent Brown to…."  *Id.* at p. 48:19-23.

When asked about the care that Mr. Brown received once he returned to FCC-TH, Dr. Orenstein summarized what the BOP primary care physicians did, including being in contact with

the orthopedic surgeons, treating Mr. Brown with medication, trying to control his pain symptoms and stretch out the contractures of his lower extremity with physical therapy, and arranging for the nerve test and neurology and surgery evaluations. He affirmed that everything the BOP did was appropriate and within the standard of care. Dkt. [124]-5 at p. 62:19-63:19; 65:4-12. However, he testified that there was no evidence that the BOP medical staff did not follow the specialists' recommendations. Dkt. [124]-5 at p. 65:13-16.

Dr. Orenstein further testified that primary care physicians can rely on their specialists in treating patients. Dkt. [124]-5, p. 48:16-23. He also agreed with Dr. Baldea that the radiological testing that Mr. Brown received was appropriate. *Id.* at p. 52:22-25.

Although not included in his expert report, Dr. Orenstein was asked about whether an anti-inflammatory could cause a temporary delay in healing. He opined that it could temporarily delay the bone in healing, but that once it was stopped, then the bone should heal normally. *Id.* at 67:5-68:3. Dr. Orenstein testified that it would not be a breach of the standard of care to give anti-inflammatories for temporary pain relief. *Id.* at p. 68:6-12.

## III. DISCUSSION

### A. Legal Standards

Pursuant to the FTCA, "federal inmates may bring suit for injuries they sustain in custody as a consequence of the negligence of prison officials." *Buechel v. United States*, 746 F.3d 753, 758 (7th Cir. 2014). State tort law of the state where the tort occurred, in this case Indiana, applies when determining "whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States,* 536 F.3d 629, 637 (7th Cir. 2008). To prevail in a medical malpractice action under Indiana law, "the plaintiff must prove three elements: (1) a duty on the part of the defendant in relation to the plaintiff; (2) failure to conform his conduct

to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure." *Whitfield v. Wren,* 14 N.E.3d 792, 797 (Ind. Ct. App. 2014) (internal quotation omitted). "[T]he standard of care for doctors practicing in prisons is the same as the standard of care for physicians practicing outside of prison." *Allen v. Hinchman,* 20 N.E.3d 863, 870 (Ind. Ct. App. 2014). "Summary judgment is appropriate in a negligence action where [the] defendant demonstrates that the undisputed material facts negate at least one element of plaintiff's claim." *Halterman v. Adams County Bd. of Comm'rs,* 991 N.E.2d 987, 990 (Ind. Ct. App. 2013) (internal quotations omitted).

"In medical malpractice cases, the parties usually must present medical expert testimony to establish the standard of care and whether particular acts or omissions by the health care provider met the standard of care." *Oaks v. Chamberlain,* 76 N.E.3d 941, 947 (Ind. Ct. App. 2017). As noted, the parties both presented medical expert opinions in this case.

## B.     <u>Analysis</u>

Mr. Brown's claims are as follows**:** (1) while he was hospitalized at Union Hospital, the physicians, including Dr. Wilson, failed to perform necessary tests to determine the cause of his leg pain—and whether he had compartment syndrome—prior to his discharge from the hospital; (2) after he was returned to FCC-TH, the BOP medical staff failed to follow Dr. Ulrich's recommendations regarding NSAIDs and pain management, resulting in delayed healing; (3) he was given the wrong type of bone stimulator; (4) the BOP medical staff failed to adequately manage his pain;  (5) the BOP medical staff failed to properly manage his nerve pain medication; (6) the BOP medical staff did not properly care for the ulcerated toes on his right foot; (7) he had to wait six months to see a neurosurgeon, causing him undue pain and suffering; and (8) the imaging studies ordered to assess the healing of his right leg were not managed properly.

There is no dispute that the United States (BOP employees) owed a duty of care to Mr. Brown, as set out generally at 18 U.S.C. § 4042(a)(2) ("The Bureau of Prisons…shall provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons … convicted of offenses against the United States…").  Mr. Brown has been incarcerated at FCC-TH since April 2008 and on August 19, 2012, Mr. Brown fractured his right leg while playing soccer at the prison and was sent to an outside hospital where he had surgery.

The United States argues that it is entitled to judgment in its favor because Mr. Brown cannot prove the second element of his medical malpractice claim, that the BOP breached its duty of care owed to Mr. Brown.

As an initial matter, Mr. Brown argues that his expert, Dr. Orenstein, stated that the defendant's expert, Dr. Baldea, was "unqualified to render an expert opinion" and that "his findings are flawed."  Dkt. [140], p. 3. (Plt's Surreply).  This is not exactly what Dr. Orenstein asserted.  Dr. Orenstein found Dr. Baldea's expert witness report "comprehensive and quite detailed."  Dkt. [105], p. 11.  Dr. Orenstein questioned whether Dr. Baldea had reviewed the complete medical records of Mr. Brown's admission to Union Hospital from August 20-31, 2012, noting that Dr. Baldea first related the onset of numbness in Mr. Brown's right foot to a sick call visit on September 7, 2012, when in reality he developed that numbness during his initial hospitalization at the hospital. *Id*.  Dr. Orenstein specifically disagreed with Dr. Baldea's assessment that Mr. Brown was non-compliant with the bone stimulator treatment. *Id.* Dr. Orenstein noted Dr. Baldea's opinion that the treatment of Mr. Brown's recurrent toe infections was appropriate but that Dr. Baldea did not opine as to the possible etiology of the recurrent toe infections and claw toe deformities that developed after surgery. *Id*.  Dr. Orenstein noted that Dr. Baldea never addressed how the diagnosis of acute compartment was ruled out. *Id.* at p. 12.  Dr.

Orenstein disagreed with Dr. Baldea's statement that acute compartment syndrome normally develops within a few hours after injury. *Id.* (Dr. Orenstein testified that acute compartment syndrome usually develops within 72 hours of an injury.) Dr. Orenstein also pointed out that Dr. Baldea was not a surgeon, did not treat tibia fractures on a regular basis, and had not personally examined Mr. Brown's right leg. Dkt. [105], p. 12. Taking all of Dr. Orenstein's comments together, he does not opine that Dr. Baldea was unqualified as an expert medical witness.

Mr. Brown's expert, Dr. Orenstein, opined that Mr. Brown has suffered from neuropathic pain in the right lower extremity "due to a delay in timely diagnosis and failure to treat [Mr. Brown's] right leg compartment syndrome." Dkt. [105], p. 7. Dr. Orenstein opined that "any prudent orthopedic surgeon presented with this scenario had a duty of care to rule out a compartment syndrome in the plaintiff's case and failure to do so would be, in my opinion, negligence and a breach in the duty of care." Dkt. [105], p. 6. Dr. Orenstein examined Mr. Brown and further opined that the unrecognized and untreated acute compartment syndrome of the right leg then developed into Volkmann's Ischemic Contracture of the anterior and posterior compartments of Mr. Brown's right leg "leaving him with permanent nerve damage, muscle damage, and deformities." *Id.* at pp. 10 and 8.

The United States does not dispute for purposes of this motion, that Mr. Brown had acute compartment syndrome. Much of this case turns on *who* was responsible for diagnosing and treating the acute compartment syndrome.

### 1.    Dr. Wilson's Role and Compartment Syndrome

Mr. Brown contends that while he was hospitalized, Dr. Wilson failed to perform necessary tests to determine the cause of his leg pain and whether he had a compartment syndrome prior to his discharge from the hospital. Mr. Brown also alleges that Dr. Wilson made the decision to

discharge him from Union Hospital. These claims are directly contradicted by Dr. Wilson's sworn declaration in which he states that he made no decisions regarding Mr. Brown's treatment while he was at Union Hospital. Specifically, Dr. Wilson did not decide when Mr. Brown would be discharged. Mr. Brown's personal belief otherwise is not based on any admissible evidence and does not create a genuine issue of material fact. *Aguilar v. Gaston-Camara,* 861 F.3d 626, 630-31 (7th Cir. 2017) ("inferences that rely upon speculation or conjecture are insufficient" to create a genuine issue for trial) (internal quotation omitted).

As noted, the primary claim in this case is Mr. Brown's allegation that Dr. Wilson should have discovered and diagnosed the acute compartment syndrome. This claim is undermined by the testimony of his own expert, Dr. Orenstein, that the physicians at Union Hospital should have made the diagnosis. During his deposition, Dr. Orenstein testified that Mr. Brown's acute compartment syndrome became symptomatic on August 22, 2012, while he was hospitalized, and that it should have been diagnosed within 24 hours of that, before he left the hospital. It is Dr. Orenstein's opinion that whoever was evaluating Mr. Brown on that day should have thought of compartment syndrome as a possibility and contacted the treating orthopedic surgeon. The treating orthopedic surgeon should then have examined Mr. Brown and checked the muscle compartments and done stretching tests, and, if the findings were positive, should have taken the compartment-pressure measurement of the anterior and posterior compartment. Mr. Brown was returned to the prison on August 31, 2012, eleven (11) days after Dr. Cho performed the surgery on August 20, 2012.

Dr. Orenstein stated that the BOP physicians did what they could do, given that they were entitled to rely on the specialists to whom they had sent Mr. Brown at the hospital. Dr. Orenstein is of the opinion that the compartment syndrome should have been diagnosed much sooner than it

was, but he does not lay the blame for that on BOP staff.  Thus, there is no genuine issue of material fact as to Mr. Brown's claim that BOP staff were responsible for the treatment he was provided while at the hospital.  The United States is entitled to summary judgment on the breach of duty element of this claim.

### 2.    Prescription of NSAIDs

Mr. Brown's second claim is that the BOP medical staff failed to follow Dr. Ulrich's recommendations regarding NSAIDs and pain management, resulting in delayed healing.  Mr. Brown was prescribed NSAIDS for a four day period in September 2012.  Mr. Brown contends that this delayed his healing for four months and resulted in him developing Volkmann's Contracture.

Mr. Brown's own expert acknowledged the use of NSAIDs in his expert report, but he made no assertion that they were inappropriate.  Dkt. [105], p. 7.  Dr. Orenstein testified during his deposition that anti-inflammatory medications would have nothing to do with Mr. Brown's compartment syndrome or Volkmann's Contracture.  Dkt. [124]-5, p. 67:5-14.  He further testified that the use of anti-inflammatories could cause a temporary delay in healing but as soon as they were stopped, healing would return back to normal.  *Id.* at p. 67-68:17-5; *see id.* at p. 68:4-5 ("So it doesn't cause appreciable delay in the healing one [sic] it's stopped.").  He also opined that it would not be a breach of the standard of care to give anti-inflammatories for temporary relief of pain.  *Id.* at p. 68:6-12.  Mr. Brown has not presented sufficient evidence to create a factual dispute regarding the temporary prescription of NSAIDs by prison physicians.  Therefore, it is undisputed that the United States did not breach any duty of care in this regard.

### 3. __Bone Stimulator__

Mr. Brown's third claim is that he was given the wrong kind of bone stimulator. He alleges that a warning in the literature for the Exogen bone stimulator indicated it was not for his type of fracture. There is no expert opinion that supports Mr. Brown's assertion. Dr. Ulrich, the hospital orthopedist, recommended a bone stimulator for Mr. Brown. He completed a Specialist Order Referral prescribing a Smith & Nephew bone stimulator for Mr. Brown. Mr. Brown was provided a different brand of bone stimulator, Exogen. Mr. Brown argues that the BOP medical staff unilaterally substituted the model and type which contained a warning that it was not tested or approved for his type of injury.

The United States' expert, Dr. Baldea, opined that the bone stimulator was frequently prescribed and approved for the treatment of fracture non-union, as in Mr. Brown's case. He further opined that the use of an Exogen bone stimulator would not be contra-indicated for Mr. Brown's fracture. Mr. Brown's expert did not opine that the use of an Exogen bone stimulator instead of a Smith & Nephew bone stimulator breached the standard of care or caused any harm to Mr. Brown. Dr. Orenstein merely noted in his initial report that Mr. Brown's fractures were slow to heal requiring dynamization of the tibial nail and the use of an Exogen bone stimulator. Dkt. [105], p. 5. Mr. Brown has not created a genuine issue of material fact as to whether the United States breached its duty of care regarding this claim.

### 4. __Post-Operative Instructions__

Mr. Brown's next claim is that BOP medical staff failed to adequately manage his pain by failing to follow the orders given by the hospital. He alleges that his pain medication was reduced by half by BOP medical staff. Mr. Brown contends that Dr. Wilson unilaterally changed his post-operative prescribed pain medication from Vicodin every four (4) hours as needed to a less

powerful and shorter acting dosage of Percocet, 2 milligrams, every eight (8) hours. He also alleges that he should not have been given crushed pills.

The hospital discharge instructions included Vicodin, 2 tablets every 4 hours as needed. Dkt. [125]-6. There was no instruction as to the duration of the Vicodin prescription. *Id.* After Mr. Brown was returned to the prison, a physician's assistant, not Dr. Wilson, prescribed Percocet 2 times a day for ten days. Dkt. [124]-2, p. 4, ¶15. It appears to be Mr. Brown's lay opinion that his pain medications were "reduced by half." Dkt. [136]. No expert opinion supports this characterization, much less concludes that his initial post-hospitalization pain medications were inappropriate. Indeed, Dr. Baldea opined that the change from Vicodin to Percocet was actually an increase in strength of pain medication and that this was an appropriate management of post-surgical pain in keeping with the standard of care.

In addition, Dr. Baldea opined that Mr. Brown's assertion about providing crushed opioid medications was incorrect, and that such medications would likely have a shorter onset of action but would last as long as uncrushed pills. Mr. Brown has presented no evidence in support of his claim that the manner he was given his pain medications violated the applicable standard of care.

Mr. Brown also argues in his response to summary judgment that BOP medical staff failed to return him to the hospital for wound care two weeks after his discharge. The post-operative plan, however, did not direct that Mr. Brown be returned to the hospital within two weeks. Rather, Mr. Brown was to "follow up in the clinic in approximately two weeks for a wound check." Dkt. [130]-3 at p. 2. The discharge instruction sheet stated: "Follow up with Dr. Wilson As Needed, Follow Up With Ortho Clinic At The Prison." Dkt. [125]-6, p. 2. The clinic referenced was at the prison, not the hospital. There is no genuine issue of material fact relating to these claims.

Therefore, the United States is entitled to summary judgment on the issue of whether it breached its duty of care on these claims.

### 5. Nerve Pain Medication

Mr. Brown next argues that BOP medical staff should have managed his nerve pain medication differently by changing his nerve medication from gabapentin to another medication, like Lyrica, sooner. Neither of the medical experts supports Mr. Brown's claim. Dr. Baldea opined that Dr. Wilson prescribed medications for neuropathic symptoms which were appropriate, were tailored to Mr. Brown's symptoms, and fell within the standard of care. Dkt. [136]-5 at p. 4. Dr. Orenstein opined that once Mr. Brown was returned to the prison, BOP staff contacted the orthopedic surgeon and gave him different kinds of medication to control nerve pain which was within the standard of care. Dkt. [124]-5 at 65:4-12. It is undisputed that the United States did not breach its duty of care in this regard.

### 6. Ulcerated Toes

Mr. Brown's sixth claim is that the BOP medical staff did not properly care for the ulcerated toes on his right foot. His expert Dr. Orenstein acknowledged that Dr. Baldea opined that the treatment of Mr. Brown's recurrent to infections was appropriate, but Dr. Orenstein questioned why Dr. Baldea did not opine as to the possible etiology of the infections and claw toe deformities. Dkt. [105], p. 11. Dr. Orenstein did not opine, however, that the treatment for Mr. Brown's toe infections was improper. Mr. Brown has presented no evidence suggesting that the treatment that BOP medical staff provided, including medical boots, wound dressings, custom orthotic pads, and regular wound checks, fell outside the standard of care. Therefore, it is undisputed that the United States did not breach its duty of care regarding this claim.

### 7. <u>Scheduling Neurosurgeon</u>

Mr. Brown's next claim is that he had to wait six months to see a neurosurgeon, causing him undue pain and suffering. This circumstance, however, is not attributable to BOP medical staff. BOP medical staff does not schedule consultations with outside specialists. Rather, a third party independent contractor NaphCare, schedules those appointments. Promptly after Dr. Wilson submitted the request for authorization, the URC approved the consultations on June 5, 2013. Moreover, no medical expert opined that there was a delay that fell outside the applicable standard of care. Dr. Baldea opined that waiting six months to see a neurosurgeon long after the date of the injury would not have caused any damage. Therefore, the United States is entitled to summary judgment on the element of breaching its duty of care on this claim.

### 8. <u>Imaging Studies</u>

Mr. Brown's final claim is that the imaging studies ordered to assess the healing of his right leg were not managed properly. This claim is not supported by any medical expert. In fact, both medical experts opined that the radiological testing Mr. Brown received was appropriate. Both experts also agreed that the April 25, 2016 x-rays and the nuclear medicine reports reflected that Mr. Brown's fractures were healed. It is undisputed that the United States did not breach its duty of care relating to this claim.

### 9. <u>Summary</u>

The Court acknowledges that Mr. Brown suffered a great deal of pain after he fractured his leg. He endured several surgeries and other treatments. The undisputed evidence, at least for purposes of this Motion, however, demonstrates that Mr. Brown's acute compartment syndrome should have been diagnosed while he was at the hospital and that many of his subsequent complications resulted from this omission. Mr. Brown's own expert testified that the BOP medical

staff provided treatment to Mr. Brown that fell within the standard of care. For all of the reasons discussed above, no reasonable trier of fact could conclude that the United States breached its duty of care. Therefore, the Court need not discuss the remaining element of causation. *See Henderson v. Reid Hosp. and Healthcare Services,* 17 N.E.3d 311, 315 (Ind. Ct. App. 2014) ("Summary judgment is appropriate if the material evidence negates one of [the three] elements" of negligence.).

## IV. CONCLUSION

For the reasons discussed in this Entry, the United States' Motion for Summary Judgment, dkt. [124], is **GRANTED.** Judgment consistent with this Entry and the Entry of August 16, 2016, shall now issue.

**SO ORDERED.**

Date: 9/19/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Daniel Lynn Brown, Jr., #05609-030
Williamsburg FCI
Inmate Mail/Parcels
P. O. Box 340
Salters, South Carolina 29590

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE
gina.shields@usdoj.gov